UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHARLES BICH and
BRUNO BICH TRUST,

        Plaintiffs,

        v.                              Case No. 20-C-1016

WW3 LLC and
CURT D. WALDVOGEL,

        Defendants.

## DECISION AND ORDER

This case arises out of a failed investment in an oil waste management treatment facility that was intended to service the oilfields in the Bakken formation in western North Dakota. The planned facility was the brainchild of Defendant Curt D. Waldvogel, who purchased the property on which the facility was to be built. Plaintiffs Charles Bich and Bruno Bich Trust made a series of investments in the planned operation totaling close to $1.8 million. The plaintiffs' investments were, for the most part, in the form of multiple loans given in return for notes issued by Branch Energy and Environmental Services, LLC (Branch), a Delaware limited liability company that was set up as the holding company for the waste management facility. Under the terms of the notes issued by Branch, the plaintiffs were given the option to convert their loans into an equity stake in Branch and thereby share in the profits. Despite the plaintiffs' substantial investment, Branch never became profitable, and the facility was leased to a third party and ultimately sold by Defendant WW3, a limited liability company Waldvogel owned and operated. None of the money

realized from the lease or sale of the property was used to repay the plaintiffs' loans. The plaintiffs brought this action against Waldvogel and WW3 in an effort to recover their investment/loans.

The complaint asserts multiple state law claims against Waldvogel and WW3, including breach of contract, breach of the covenant of good faith and fair dealing, quantum meruit, unjust enrichment, conversion, and statutory theft. It also includes a claim for piercing the corporate veil between Waldvogel and WW3. The court has jurisdiction under 28 U.S.C. § 1332. Before the court are the parties' cross-motions for summary judgment. For the following reasons, both motions will be granted in part.

## BACKGROUND

Waldvogel, a citizen of the State of Wisconsin, is the sole owner and operator of WW3, a Wisconsin limited liability company with its principal place of business located in Antigo, Wisconsin. Pls.' Proposed Findings of Fact (PPFOF) ¶¶ 6–7, Dkt. No. 27. On June 9, 2014, after discussing his plan with some of his associates—Jerry Campbell, Brian Bruns, and Al Markegard—Waldvogel purchased real property on the Fort Berthold Reservation in North Dakota (the Property) to serve as the location for a new oilfield waste management facility (the Facility). *Id.* at ¶¶ 13, 17–18. Waldvogel paid $300,000 for the Property. The Property was vacant at the time of the purchase, and Waldvogel sought out investors for the capital to construct and operate the Facility on the newly purchased Property. *Id.* at ¶¶ 19, 22. To that end, Waldvogel approached Plaintiff Charles Bich, a citizen of the State of New York, in the summer of 2014 to discuss his possible investment in the project. *Id.* at ¶¶ 1, 23.

Waldvogel told Bich that (1) the Facility would be the first and only transportation, reclamation, and disposal facility allowed to operate on the Fort Berthold Reservation; (2) all oil waste originating from reservation lands would be exclusively processed by the Facility; and (3)

2

any permitting for the Facility and operator would be negligible. *Id.* at ¶ 26. Waldvogel further represented that his two partners, Bruns and Campbell, would each serve as officers for the new venture and would be actively involved in the management and operation of the Facility. *Id.* at ¶ 27. Bich asserts that Waldvogel promised him and other investors that, "regardless of the ultimate success of the venture, any investment made by them would be backed by the Property and facility that would subsequently be built on the Property." *Id.* at ¶ 30. The asserted promise was never reduced to a written contract, and the defendants deny that such a promise was ever made. Resp. to PPFOF ¶ 30, Dkt. No. 36. Bich asserts that this promise made the opportunity appealing to him, and that, but for the promise, he would not have invested in the Facility. PPFOF ¶ 36.

Bich agreed to invest in the project through a series of convertible notes issued by the ultimate holding company of the operation. *Id.* at ¶ 37. That company, Branch, served as the holding company for Mandaree Project, LLC, the Facility's operating company. *Id.* at ¶¶ 38–40. After the creation of these entities, Bich consulted his father, Bruno Bich, also of New York, about investing in the project on the same terms. Bruno Bich authorized investments in the project through Bruno Bich Trust (BBT), which is organized under the laws of Delaware, where the trust is located. *Id.* at ¶¶ 45–46. Shortly thereafter, on September 28, 2014, Bich loaned Branch $250,000. *Id.* at ¶ 50.

On October 1, 2014, Waldvogel transferred ownership of the Property to WW3. *Id.* at ¶ 51. The following months saw a flurry of investment activity from Bich and BBT: (1) on October 10, 2014, Bich loaned Branch an additional $250,000; (2) on November 11, 2014, Bich loaned Branch an additional $125,000; and (3) in December 2014, BBT loaned Branch $625,000. *Id.* at ¶¶ 53–

3

55. Using these funds, the parties constructed a state-of-the-art oilfield waste management facility. *Id.* at ¶ 56.

Unfortunately, Branch and Mandaree did not perform as expected. It turned out that the Facility was not an exclusive servicer for oil waste originating from the reservation and that many customers refused to utilize the Facility because it did not have the proper permits. *Id.* at ¶ 58. By the middle of 2015, Branch was in need of additional capital, leading Waldvogel to contact Bich. *Id.* at ¶ 59. Bich and BBT each loaned Branch an additional $175,000 to keep the project afloat. *Id.* at ¶ 60. Around the same time, the parties were in the process of executing a lease of the Property between WW3 and Branch/Mandaree. *Id.* at ¶ 63. In an email to Bich with the subject line "land lease" and a date of April 1, 2015, Waldvogel wrote, "Charles[:] This is the start of what I have. Know there's more needed. Add as you think needed." Dkt. No. 30-1 at 95. The email then provided the following:

Branch Energy – Land Lease/Purchase Agreement

1. Curt Waldvogel will lease 20 acre property to Branch Energy for 50.00/acre annually.
2. Branch Energy will purchase the Property from at a time that suits Branch. Land purchase will be set at total costs Curt has into property plus 10% annual interest.
3. In the event of a land sale, Curt and Branch investor(s) will recapture investment first. Monies in excess of that will be distributed to owners of Branch based on their percentage ownership at time of sale.

*Id.* at 96; PPFOF ¶ 64.

Despite this second round of cash infusion, Branch and Mandaree continued to perform poorly throughout 2015. PPFOF ¶ 65. Still, Bich continued to loan money to Waldvogel. Indeed, when Branch required equipment, including a centrifuge and effluent tank, Bich loaned Waldvogel $30,000 by wiring it to WW3's bank account. *Id.* at ¶¶ 67, 70. Even with the purchase of

additional equipment, Branch continued to falter, leading creditors to seek payment and file lawsuits. *Id.* at ¶ 72.

As things headed south, Bich emailed Waldvogel to discuss the Property. In the email, dated January 28, 2016, Bich stated:

> We have discussed many times that we need to put our agreement in writing. As we provided the vast majority of the funding to build the facility on your land owned through WW3 LLC. The money was placed in the operating company as we thought it best to keep the land in a separate LLC for liability reasons. If there is a need to shut down branch energy or mandaree project we will still be partners on anything done with the land. We have discussed possibly leasing the land to an operator and we would split the rent based on each person's capital contribution including what you paid for the land. When we have all recovered our capital we can split the rent differently. Please let me know what else you would like in this agreement as we discussed that we would not need lawyers to draw up a contract but that we would have our agreement in writing.

Dkt. No. 30-1 at 100; PPFOF ¶ 75. In response, Waldvogel wrote:

> I agree with this as we have spoke about this much in the past. The only thing that concerns me are the outstanding debts that are tied to either WW3, LLC or myself personally from the operations of Branch. All factors need considered when determining how/what we do to come out of this whole, if it comes to that. Needless to say, the people who put the capital in to get this built and keep operating will be first in line to get repaid, if at all possible.

Dkt. No. 30-1 at 100; PPFOF ¶ 76.

As 2016 progressed, the downturn continued. First, Bich and Waldvogel learned that Bruns had been irresponsibly handling Branch and Mandaree's money, leading to the removal of Bruns from his position as an officer of those entities. PPFOF ¶¶ 77–78. Second, by the middle of 2016, Waldvogel resigned from Branch and left the project altogether. *Id.* at ¶ 79. Soon thereafter, Waldvogel learned that the Property had been abandoned and left in a state of disrepair. *Id.* at ¶¶ 80–81. At this point, it became apparent that the project was a failure, and Bich and Waldvogel determined that it would be prudent to cease Branch and Mandaree's operations and

explore leasing the Facility to a third party.  *Id.* at ¶¶ 82–83.  Around this time, Bich loaned

Waldvogel an additional $45,000.  *Id.* at ¶ 86.

On February 1, 2017, WW3 entered into a lease agreement with Little Knife Disposal LLC

for use of the Property.  *Id.* at ¶ 87.  Little Knife is a single-member LLC wholly owned by Shawn

Kluver.  *Id.* at ¶ 88.  Under the terms of the lease, Little Knife was to operate the Facility and make

monthly rent payments to WW3.  Little Knife also had an option to purchase the Property for

$2,675,000.  *Id.* at ¶¶ 90–91.  Bich asserts, and the defendants vigorously contest, that the sale

price was intended to be the total capital invested by all parties, allowing the group to recover the

entirety of their investment.  Resp. to PPFOF ¶ 92.  The plaintiffs also assert, and the defendants

also contest, that rent payments under the terms of the lease were to be used to repay the plaintiffs'

investment.  *Id.* at ¶ 93.  In any event, Waldvogel did not remit any lease payments made to WW3

to Bich.  PPFOF ¶ 94.  Waldvogel did, however, remit payments to himself through WW3.  *Id.* at

¶ 95.

The saga continued in January 2018, when Waldvogel represented to Bich that he needed

cash to repay a creditor of the Facility that was pursuing him regarding a personal guarantee.  *Id.*

at ¶ 96.  In response, Bich wired WW3 $50,000.  *Id.* at ¶ 97.  On January 12, 2018, Bich sent

Waldvogel a chart detailing the investments into the project by himself, BBT, Waldvogel, and

Glenn Dice, Jr.  *Id.* at ¶ 98.  The chart showed that Bich and BBT had put nearly $1,800,000 into

the project and that Waldvogel and Dice had collectively contributed around $1,040,000.  *Id.* at

¶ 99.  None of this money was ever repaid.

By early 2019, Waldvogel ceased all communications with Bich and did not respond to

Bich when he requested an update on the status of the project.  *Id.* at ¶¶ 101–03.  Ultimately, in

September 2020, WW3 sold the Property to LKD Holdings, an entity affiliated with Kluver, for

$1,800,000.  *Id.* at ¶¶ 104–05.  Waldvogel entered into this purchase agreement without Bich's knowledge or consent and did not remit any of the purchase price of the Property to Bich or BBT. *Id.* at ¶¶ 106–07.

Both parties have filed motions for summary judgment.  The plaintiffs seek partial summary judgment on their breach of contract claim, or alternatively, their claims for unjust enrichment or quantum meruit.  The defendants, on the other hand, seek summary judgment on all of the plaintiffs' claims.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party.  *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.*  Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

As noted above, the court is exercising diversity jurisdiction over this action under 28 U.S.C. § 1332. Federal courts deciding state law claims under diversity jurisdiction apply the forum state's choice of law rules to select the applicable state substantive law. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014) (citations omitted). A choice of law issue can be waived, however, if a party fails to assert it. *Vukadinovich v. McCarthy*, 59 F.3d 58, 62 (7th Cir. 1995). When no party raises the choice of law issue, the federal court may simply apply the forum state's substantive law. *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009). Because neither side has raised a choice of law issue, and both apply Wisconsin law, the court will do the same.

### A. Contract Claims

Both the plaintiffs and the defendants have moved for summary judgment on the plaintiffs' claims for breach of contract and breach of the covenant of good faith and fair dealing. To address the parties' respective arguments, the court must first determine whether a valid contract was formed and what performance the contract required.

"The elements of an enforceable contract are offer, acceptance, and consideration." *Runzheimer Int'l, Ltd. v. Friedlen*, 2015 WI 45, ¶ 20, 362 Wis. 2d 100, 862 N.W.2d 879 (citing *Rosecky v. Schissel*, 2013 WI 66, ¶ 57, 349 Wis. 2d 84, 833 N.W.2d 634. "The existence of an offer and acceptance are mutual expressions of assent, and consideration is evidence of the intent to be bound to the contract." *Id.* (quoting *NBZ, Inc. v. Pilarski*, 185 Wis. 2d 827, 837, 520 N.W.2d 93 (Ct. App. 1994) (citing 1 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS §§ 11, 112 (1963)). Consideration has been defined as "'a detriment incurred by the promisee or a benefit received by the promisor at the request of the promisor. . . . Neither the benefit to the promisor nor the detriment

8

to the promisee need be actual.'" *Id.* at ¶ 21 (citing *First Wis. Nat'l Bank v. Oby*, 52 Wis. 2d 1, 5, 188 N.W.2d 454 (1971) (quoting 1 SAMUEL WILLISTON & WALTER H.E. JAEGER, A TREATISE ON THE LAW OF CONTRACTS §§ 102, 102A (3d ed.1957))) (alterations in original).

The defendants contend that the only contracts related to the plaintiffs' loan/investments are the convertible notes that were issued by Branch. Dkt. No. 24 at 9–10. Since WW3 was not a party to those contracts, the defendants contend that the plaintiffs' contract claims fail as a matter of law. The convertible notes are not the contracts that the plaintiffs allege the defendants breached, however. Although the complaint is less than clear, the court can discern at least three separate contracts that the plaintiffs allege were breached by one or both of the defendants. These contracts consist of (1) a loan for $30,000 made by Charles Bich to WW3, (2) a second loan in the amount of $50,000 made by Charles Bich to Waldvogel, and (3) Waldvogel's promise that the Property that he transferred to WW3 would back any loans the plaintiffs made to Branch for the project. The court will address the loans made by Charles Bich first.

### 1. Outstanding Loans

Bich argues that WW3 and Waldvogel are liable for two separate loans. A loan given in return for a promise to repay is a contract. *See Wells Fargo Bus. Credit v. Hindman*, 734 F.3d 657, 666 (7th Cir. 2013) ("A loan is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.") (applying Wisconsin law).

First, Bich asserts that WW3 is liable to him in the amount of $30,000, which he loaned WW3 in October 2015 for the purchase of equipment to be used at the Facility. PPFOF ¶¶ 67–70. There appears to be no dispute that Bich loaned $30,000 to WW3 for the equipment purchase. *Id.*; Resp. to PPFOF ¶ 70 ("The money was loaned as referenced."). And although Bich has provided

9

no documentation of the loan or any evidence of the terms under which it was made, the defendants offer no defense to Bich's claim that it is due and owing. It appears there was no agreement as to when repayment was to be made.

The same is true with respect to the loan Bich claims he made to Waldvogel personally. Bich states that he loaned Waldvogel $50,000 in January 2018 to pay off a debt Waldvogel had guaranteed. PPFOF ¶¶ 96–97. It is undisputed that Waldvogel did not repay this loan. Resp. to PPFOF at ¶ 100. And, again, the defendants offer no defense to Bich's claim that repayment is due and owing.

Under Wisconsin law, when a person loans money to another and there is no agreement as to when repayment is to be made, it is called "money loaned upon demand." *Barry v. Minahan*, 127 Wis. 570, 573, 107 N.W. 488 (1906); *see also Accola v. Giese*, 223 Wis. 431, 433, 271 N.W. 19 (1937). The loan is due when it is made. Absent any assertion by the defendants that repayment of the loans is not currently due, the court will grant summary judgment on both individual contract claims for nonpayment of loans made by Charles Bich. The court concludes that WW3 and Waldvogel breached the loan contracts and that Charles Bich is entitled to recover the sum of $30,000 from WW3 and the sum of $50,000 from Waldvogel.

**2. Plaintiffs' Loans to Branch**

The plaintiffs' primary contract claims concern the loans they made to Branch. The plaintiffs allege that Waldvogel and WW3 promised or agreed, as part of a separate and independent contract, that the plaintiffs' loans/investments to Branch would be "backed" by the Property owned by WW3 and the Facility that was to be built upon it. This promise, the plaintiffs contend, was essential to their decision to invest in the project. The plaintiffs further contend that

10

they accepted Waldvogel's offer and that their loans to Branch to fund Waldvogel's project constitute the consideration required to complete the formation of a contract between them.

Waldvogel, on the other hand, denies that he ever made such a promise or conveyed such an offer to the plaintiffs. He acknowledges that, beginning in August 2015, the parties discussed "different plans or options to recoup investments," but claims they never came to any agreement that the Property would be used as security. Resp. to PPFOF at ¶ 47. Thus, a factual dispute precludes the court finding as a matter of law that the essential elements of a contract between the parties are present.

The defendants contend, however, that even if the plaintiffs' version of the facts is true, their contract claims nevertheless fail because the contract they allege existed is void under Wisconsin's Statute of Frauds. In support of their argument, the defendants cite Wis. Stat. § 241.02, which states that certain agreements "shall be void unless such agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith." § 241.02(1). Among the agreements included under the statute is "[e]very special promise to answer for the debt, default or miscarriage of another person." § 24.02(1)(b). The defendants argue that the promise the plaintiffs allege Waldvogel made is just such an agreement. And since the alleged promise was not in a writing signed by Waldvogel, the defendants argue that, even if a jury believes the plaintiffs' version of the facts, their contract claims fail.

In response, the plaintiffs argue that Wisconsin's Statute of Frauds does not apply. The plaintiffs contend that Waldvogel's promise that any investment they made would be "backed" by the Property held by WW3 was not a "special promise" within the meaning of § 241.02(1)(b). Relying on *Publishers Advertising Associates, Inc. v. The Wessel Co., Inc.*, 747 F.2d 1076 (7th

Cir. 1984), the plaintiffs argue that the term "special promise," as used in the Statute of Frauds, refers to a "collateral" promise, as opposed to an "original" or "independent" promise. Dkt. No. 42 at 6–8 (citing *Publishers Advert.*, 747 F.2d at 1079–80). A collateral promise to answer for the debt of another, they contend, is one in which the debt is already in existence when the promise is made; whereas an original or independent promise is one which is made before the debt is incurred and provides at least part of the incentive for loaning the money in the first place. *Id.* The plaintiffs contend that Waldvogel's promise that their investments would be "backed" by the Property was made before they began investing in the project and, in fact, was a major part of the motivation for their decision to invest. As such, they contend that Waldvogel's promise constitutes an "original" or "independent" promise that does not fall within the Statute of Frauds. *Id.*

There are several problems with the plaintiffs' argument. The first is that in *Publishers Advertising*, the case on which the plaintiffs rely, the court was construing Illinois' Statute of Frauds, not Wisconsin's. Wisconsin courts have adopted a broader interpretation of the kinds of promises that fall within the Statute of Frauds. Under Wisconsin law, a special promise "[t]o answer for the debt of another means not the assumption of the debt, or its extinguishment and substitution of the new promise but a promise collateral and dependent upon the obligation to pay of another person and to pay the debt upon breach of such primary promise." *Mann v. Erie Mfg. Co.*, 19 Wis.2d 455, 459, 120 N.W.2d 711 (1963). In other words, a promise to pay the debt of another falls within the Statute and must be in writing if the original debt remains and the promise is contingent upon the original debtor failing to pay. *See Prize Steak Prods., Inc. v. Bally's Tom Foolery, Inc.*, 717 F.2d 367, 369 (7th Cir. 1983) ("*Mann* holds the statute of frauds applicable so long as 'the promise is in fact one to answer for the debt and default of another . . . .'" (quoting *Mann*, 19 Wis. 2d at 462)) (applying Wisconsin law).

12

In Wisconsin, there is also no requirement that the debt already exist for the promise to be considered "collateral." *See Mann*, 19 Wis. 2d at 457–58 (manufacturer's promise to guaranty payment of sales representative's commissions owed by distributor on future sales held void); *Cook & Franke, S.C. v. Meilman*, 136 Wis. 2d 434, 437, 402 N.W.2d 361 (Ct. App. 1987) (oral promise to pay third party's yet to be incurred legal fees is unenforceable under the Statute of Frauds); *see also Prize Steak Prods.*, 717 F.2d at 369 (franchisor's promise to food supplier to pay future debts of franchisees if franchisees defaulted held void under Wisconsin Statute of Frauds). Nor does it matter whether the promisor was motivated to make the promise by his own self-interest. *Mann*, 19 Wis. 2d at 461 (noting that Wisconsin Supreme Court has "examined the beneficial-consideration doctrine and rejected it as such"); *Cook & Franke*, 136 Wis. 2d at 437 (same); *Prize Steak Prods.*, 717 F.2d at 369 ("The promisor's motive or purpose in making the promise does not in and of itself take the promise outside of the statute of frauds, but is merely evidence used to determine if in fact the promise was intended to create a primary obligation.").

Applying Wisconsin law to the facts of this case, it is clear that the promise allegedly made by Waldvogel, to the extent § 241.02(1)(b) applies, falls within Wisconsin's Statute of Frauds. By its terms, as recounted by the plaintiffs, it was not an "original" or "independent" promise but was instead contingent upon the plaintiffs not being able to recover their investment through the profits generated by the project. The promise was that the Property would "back" their investment, not that the Property was to take the place of the debt owed by Branch. Thus, under Wisconsin law, the contract alleged by the plaintiffs would be void, even assuming their version of the facts.

Another problem with the plaintiffs' argument is that the promise they claim Waldvogel made to them does not appear to be a "promise to answer for the debts of another," within the meaning of § 241.02(b)(2). Waldvogel, even according to the plaintiffs, did not guarantee

13

Branch's debt to the plaintiffs; he did not agree to assume personal liability for it. According to the plaintiffs, his promise was that the Property would "back" their loans. In other words, the Property would serve as security for the debt. This is not so much a promise to pay as it is a pledge of security or, in the language of real property, a mortgage. In other words, the plaintiffs' claim is really that Waldvogel promised to give them a mortgage in the Property to secure their loans for the project. But a mortgage, no less than a promise to answer for the debt or another, is subject to the Statute of Frauds. A mortgage is an interest in real property, the creation of which requires a written conveyance. Wis. Stat. §§ 706.001(1), 706.01(4). A conveyance that does not satisfy the statute is void. *State Bank of Drummond v. Christophersen*, 93 Wis. 2d 148, 157, 286 N.W.2d 547 (1980). Under Wisconsin law, a conveyance must identify the parties, identify the land, identify the interest conveyed, and be signed by or on behalf of each of the grantors. Wis. Stat. § 706.02(1). Because Waldvogel's alleged promise was not in writing and met none of these requirements, the alleged contract would be void.

For this reason, as well, the plaintiffs' contract claims relating to their loans to Branch fail. From the undisputed facts before the court, it is clear that no valid contract was formed with Waldvogel or WW3 concerning those loans. Absent a valid contract, all of the plaintiffs' contract claims concerning the Branch loans fail. This includes not only their breach of contract claims, but also what they designate in their complaint as a claim for breach of the Covenant of Good Faith and Fair Dealing (Claim 2). Compl. at 8. Under Wisconsin law, "every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties; that a violation of the implied promise of good-faith dealing may be considered independent of any breach of the underlying contract . . . ." *Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶¶ 29, 46, 348 Wis. 2d 360, 842 N.W.2d 240. Absent a valid contract, however, no covenant of good

14

faith and fair dealing arises between the parties as a matter of law. The defendants' motion is therefore granted as to these claims, and the plaintiffs' contract claims concerning their loans to Branch are dismissed.

## B. Quantum Meruit and Unjust Enrichment Claims Against WW3

With the contract claims concerning the Branch loans gone, the court turns to the plaintiffs' claims for quantum meruit and unjust enrichment (Claims 3 and 4). Both parties have moved for summary judgment on these claims, as well. In order to assess their arguments, it will be helpful to recall the elements of these claims. The case of *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, provides a thorough and helpful discussion of the Wisconsin law governing these two claims. 557 F.3d 469, 476–81 (7th Cir. 2009). As the court explained, "[i]n the absence of an enforceable contract, . . . a plaintiff may turn to quasi-contractual theories of relief." *Id.* at 476. "Unjust enrichment and quantum meruit are two such actions." *Id.* "Though related in theory and residing in the domain of contract law under the heading of quasi-contract, each of these claims has its own distinct elements of proof and measure of damages." *Id.* (citing *Ramsey v. Ellis*, 168 Wis. 2d 779, 785, 484 N.W.2d 331 (1992) ("[Q]uantum meruit is a distinct cause of action from an action for unjust enrichment, with distinct elements and a distinct measure of damages.")).

### 1. Quantum Meruit

"[Q]uantum meruit is a legal cause of action grounded in equitable principles." *Id.* at 477 (citing *Tri State Home Improvement Co. v. Mansavage*, 77 Wis. 2d 648, 660, 253 N.W.2d 474 (1977)). "[R]ecovery in quantum meruit is based upon an implied contract to pay reasonable compensation for services rendered." *Ramsey*, 168 Wis. 2d at 785. "[T]o recover under quantum meruit, the plaintiff must prove that 'the defendant requested the [plaintiff's] services' and 'the

15

plaintiff expected reasonable compensation' for the services." *Lindquist Ford*, 557 F.3d at 477 (quoting *Ramsey*, 168 Wis. 2d at 784–85).

The plaintiffs' claim for quantum meruit fails in this case for the simple reason that the plaintiffs performed no services for, or at the request of, the defendants. The plaintiffs loaned their own money to Branch, WW3, and Waldvogel; they did not perform services for them. Giving someone money is not the same as performing a service for him. The plaintiffs' claim for quantum meruit (Claim 3) will therefore be dismissed.

### 2. Unjust Enrichment

"In Wisconsin unjust enrichment is a legal cause of action governed by equitable principles." *Id.* at 476–77. A claim for unjust enrichment is "grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust." *Watts v. Watts*, 137 Wis. 2d 506, 530, 405 N.W.2d 303 (1987). To prevail on an unjust-enrichment claim, a plaintiff must prove three elements: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Seegers v. Sprague*, 70 Wis. 2d 997, 1004, 236 N.W.2d 227 (1975) (internal quotation marks omitted); *accord Ramsey*, 168 Wis. 2d at 785.

The plaintiffs contend that the undisputed facts establish each of the required elements here. The first element is met, they contend, in that they "provided a tangible benefit to WW3 by funding the construction of a $1.8 million state-of-the-art facility on the Property owned by WW3." Dkt. No. 44 at 12. As to the second element, the plaintiffs contend that WW3 appreciated the benefit by first receiving all of the lease payments, as well as the $1.8 million purchase price

16

for the Property, representing a 500% return on Waldvogel's initial purchase of the Property. *Id.* at 13. The third element is met, the plaintiffs argue, because allowing WW3 to retain the benefit it received would be grossly inequitable in light of the amount of money they invested and Waldvogel's promise that their investment would be "backed" by the Property. Because there is no dispute that these elements are met, the plaintiffs contend that they are entitled to summary judgment on their unjust enrichment claim.

The defendants, on the other hand, deny that the plaintiffs' investment conferred any benefit upon them directly. They argue that the plaintiffs did not confer a benefit upon them but instead upon Branch. They also assert that, to the extent any benefit was conferred upon the defendants by the plaintiffs, the path to liability is too remote. Specifically, the defendants assert that the benefit would have first passed from the plaintiffs to Branch via their loans/investment, and then from Branch to WW3 through the construction of the Facility, which in turn, increased the value of WW3's property. The defendants assert that this "long sequence of people and entities involved is very remote and the degree of separation is much too high to support a claim of unjust enrichment." Dkt. No. 34 at 18.

The defendants cite to *Puttkammer v. Minth*, 83 Wis. 2d 686, 266 N.W.2d 361 (1978), as support for their contention that the plaintiffs are not entitled to recover on their claim for unjust enrichment. In that case, the lessee of a supper club contracted to have the access and service areas of the supper club resurfaced by the plaintiff contractor. When the lessee declared bankruptcy, the contractor sued the landlord/owner of the property on a claim for unjust enrichment. The contractor claimed that, even though the owner had not contracted for the work, it nevertheless benefitted his property and thus it would be inequitable to allow him to retain the benefit without

17

paying for it. *Id.* at 690. On these facts, the Wisconsin Supreme Court held that the contractor could not recover against the owner/landlord of the property:

> The unjust enrichment or restitution claim is asserted by one who did the work, and produced an incidental gain to the owner, by merely performing his contract with another and is now dissatisfied because the return promised under the contract is not forthcoming. In a sense it can be said that the contractor, at least to the extent of the gain, seeks to make the owner an insurer of the contract entered into by the defaulting procurer. The fact that the owner knew of the work, acquiesced in its performance and voiced no disapproval of the work, does not make the owner liable. There is no allegation in the instant complaint from which it can reasonably be inferred that the work was done by authority of the owner.

*Id*. at 693. Just as the owner of the property was not liable for the debt incurred by the lessee in *Puttkammer*, the defendants argue that neither Waldvogel nor WW3, the owner of the Property, can be held liable for the debt incurred by Branch in constructing the waste management facility in this case.

Unlike the owner/landlord in *Puttkammer*, however, the evidence in this case suggests that Waldvogel was not passive with respect to the plaintiffs' investment. Waldvogel did not simply acquiesce in the use of the plaintiffs' funds to develop the Property. The evidence shows that Waldvogel, on his own behalf or as owner of WW3, recruited investors for the express purpose of constructing and operating the waste management facility. The money was used to directly benefit the Property WW3 owned. Also, unlike the facts in *Puttkammer*, the benefit to the Property was not "incidental." The funds supplied by the plaintiffs were used to construct a state-of-the-art facility that Waldvogel was able to sell for five times what he paid for the Property. Given these factual distinctions, *Puttkammer* does not support the defendants' argument that they are entitled to summary judgment on the plaintiffs' unjust enrichment claim.

The defendants also cite the Wisconsin Court of Appeals' unpublished decision in *Fischer v. Renner* in support of their argument that there is simply too high a degree of separation among

the parties. 2013 WI App 84, 348 Wis. 2d 763, 833 N.W.2d 873. In that case, the Fischers invested in a car dealership business that failed. The business had been owned by James Renner, but he transferred it to his sons in 2002 and 2003. After the sale, Renner remained a personal guarantor of the operations line of credit for one of the dealerships. Several years later in 2006, the Fischers invested in the business. As part of the transaction, the Fischers took on liability for their pro rata share of the existing debt of the business. When the business failed, the Fischers sued Renner's sons for fraud. In 2010, after they settled that lawsuit, the Fischers filed a second suit against Renner himself on a claim of unjust enrichment on the theory that he benefitted from the use of corporate assets to pay off the debt he had guaranteed. The circuit court granted summary judgment, holding that "unjust enrichment cannot be found from this set of facts because of the remoteness, the separation, the organizational and legal barriers involved." *Id.* at ¶ 7. The court of appeals agreed with the circuit court's holding and further concluded that there was no basis for finding the transaction unjust: "There is nothing unusual about this business scenario. This investor/guarantor circumstance does not provide the basis for an unjust enrichment claim between two parties with no contractual relationship and no facts to show that a benefit was unjustly conferred." *Id.* at ¶ 10.

The defendants argue that the same conclusion follows here. Again, however, the factual distinctions between this case and *Fischer* undermine the logic of the defendants' argument. In *Fischer*, the co-owners of the business sought to recover from a third-party who guaranteed the business' debt on the theory that the guarantor was unjustly benefitted when corporate assets were used to reduce the debt he otherwise owed. The argument makes no economic sense on its face. Business creditors have priority over equity holders as a matter of law. *See Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 646 F.3d 401, 408 (7th Cir. 2011) ("The

19

creditors' priority in bankruptcy mirrors the contractual allocation of risk and reward between creditors and shareholders."). It would have been improper for the business owners not to pay creditors before themselves. Here, by contrast, the plaintiffs are seeking to recover the benefit they conferred on Waldvogel and WW3 by loaning the money used to construct a state-of-the-art waste management facility on land owned by Waldvogel/WW3. Absent the plaintiffs' loans, the value of the Property would have been a fraction of the purchase price Waldvogel was able to obtain for it. There is also evidence that Waldvogel expressly promised that the improved property would be used to secure the loans the plaintiffs made and thereby ensure that their investment would not be lost. In light of this evidence, a jury could reasonably conclude that it would be inequitable for the defendants to retain the benefit they received from the plaintiffs' investment/loans. Accordingly, the defendants are not entitled to summary judgment on the plaintiffs' claim for unjust enrichment.

But neither are the plaintiffs. As *Lindquist Ford* makes clear, the question of whether a party can recover on a claim of unjust enrichment is factually intense. The question of whether retention of a benefit by a party is inequitable is a complicated one that is seldom susceptible to a favorable ruling on summary judgment. It depends largely upon the facts and context, several of which, such as what if any promise was made to the plaintiffs, are disputed by the parties. 557 F.3d at 582–83.

Other factors that bear on the equities of the case are the degree of the plaintiffs' sophistication as investors and the reasons they did not take steps to protect themselves from just such a result. Even the question of whether Waldvogel benefitted and to what degree is also less than clear on this record. Waldvogel also expended time and money on the project in the hope that he would realize a substantial return on his investment. Decl. of Curt D. Waldvogel ¶¶ 44–

20

50, Dkt. No. 22. The extent of his investment and efforts devoted to the project must also be considered in deciding whether his retention of some or all of the benefit conferred on the project by the plaintiffs is just. For this reason, summary judgment is denied as to the plaintiffs' claim for unjust enrichment (Claim 4).

## C. Civil Theft and Conversion Claims Against Waldvogel

The defendants next argue that they are entitled to summary judgment on the plaintiffs' claims for conversion and civil theft. To establish a claim for conversion, a plaintiff must show "(1) intentional control or taking of property belonging to another, (2) without the owner's consent, [and] (3) resulting in serious interference with the rights of the owner to possess the property." *H.A. Friend & Co. v. Prof'l Stationery, Inc.*, 2006 WI App 141, ¶ 11, 294 Wis. 2d 754, 720 N.W.2d 96. And to establish a claim for civil theft under Wis. Stat. § 895.446 via Wis. Stat. § 943.20, a plaintiff must show: (1) the defendant intentionally used, transferred, or retained possession of movable property of another; (2) the owner of the property did not consent to taking and carrying away the property; (3) the defendant knew the owner did not consent; and (4) the defendant intended to deprive the owner permanently of the possession of the property. *Estate of Miller v. Storey*, 2017 WI 99, ¶ 40, 378 Wis. 2d 358, 903 N.W.2d 759.

The defendants argue that the plaintiffs' claims for conversion and statutory theft under Wis. Stat. § 943.20 fail for the same reason: there is no evidence that the defendants took or retained possession or control of the plaintiffs' property without their consent. "Under Wisconsin law, both conversion and civil theft require the victim to have an ownership interest in the property converted or stolen." *Milwaukee Ctr. for Independence, Inc. v. Milwaukee Health Care, LLC*, 929 F.3d 489, 494 (7th Cir. 2019). It is undisputed that the plaintiffs voluntarily loaned funds to Branch, Waldvogel, and WW3. There is no allegation that the money was obtained by fraud or

mistake.  Nor is there any allegation that the money loaned to Branch and the defendants was used for a purpose other than what the plaintiffs intended.  Failure to repay a loan, especially a loan to a third party, is not conversion or theft.  *See JPMorgan Chase Bank, N.A. v. Smith Bros. Builders & Supply, Inc.*, No. 1:08-cv-1504-DFH-DML, 2009 WL 2413832, at *2 (S.D. Ind. July 27, 2009) ("Indiana courts have repeatedly held that a mere failure to pay a debt does not amount to civil or criminal conversion.").  The same is true in Wisconsin.

Having voluntarily loaned their money to others to be used to finance the construction and operation of the Facility, the plaintiffs cannot bring a claim for conversion or theft.  The money was neither taken nor used without their consent.  While the defendants may be liable to the plaintiffs on their claim of unjust enrichment, there is no evidence that the defendants converted or stole the plaintiffs' property.  Summary judgment is therefore granted on the plaintiffs' claims for conversion (Claim 7) and civil theft (Claim 8), and those claims are dismissed.

**D.  Piercing the Corporate Veil**

The defendants also seek summary judgment on the plaintiffs' fifth claim for relief.  The fifth claim for relief in the Complaint is entitled "Piercing the Corporate Veil–WW3 and Waldvogel."  Compl. at 9.  Piercing the corporate veil is an equitable remedy which is used to avoid the shield from personal liability for business obligations that individuals who adopt a corporate form normally enjoy.  *Consumer's Co-op. of Walworth Cnty. v. Olsen*, 142 Wis. 2d 465, 472–75, 419 N.W.2d 211 (1988).  The same shield from personal liability extends to owners of limited liability companies.  Wis. Stat. § 183.0304(1).  Wisconsin courts have held that "a shareholder's act will be treated as a corporate act and the existence of the corporation as an entity apart from the natural persons comprising it will be disregarded, if corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the

mere *instrumentality* of the shareholder and the corporate form is used to evade an obligation, to

gain an unjust advantage or to commit an injustice." *Wiebke v. Richardson & Sons, Inc.*, 83 Wis.

2d 359, 363, 265 N.W.2d 571 (Wis. 1978) (citing 1 FLETCHER, CYCLOPEDIA CORPORATIONS, at

§ 42 (1974 Rev. Vol.) (emphasis added). Wisconsin courts have similarly held that under such

circumstances the shareholders, directors, and officers of a corporation may be considered the

"alter ego" of the corporation and held personally responsible for corporate obligations.

*Consumer's Co-op*, 142 Wis. 2d at 483 n.4. Under Wisconsin law, the "instrumentality" or "alter

ego" doctrine requires proof of the following elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 484. The same doctrines apply to limited liability companies. Wis. Stat. § 183.0304(2).

It is unusual to see "Pierce the Corporate Veil" asserted as an independent claim in a case

such as this. It is not really a claim at all; instead, it is a legal theory for imposing liability for a

claim against a limited liability company on the owners, or vice versa. The plaintiffs apparently

intend to give notice of their view that Waldvogel may be held liable for any claim on which they

prevail against WW3 and that WW3 can be held liable for any claim on which they prevail against

Waldvogel. Based on the court's previous rulings, the only claim remaining in the case is the

plaintiffs' unjust enrichment claim against WW3. If the plaintiffs prevail on this claim and grounds

for "piercing" the LLC veil exist, the plaintiffs will be able to collect either from WW3 or

Waldvogel. By seeking summary judgment on the plaintiffs' "Pierce the Corporate Veil" claim, the defendants apparently seek a ruling that this theory fails as a matter of law based on the undisputed facts of the case.

In support of their motion, the defendants assert that the first prong of the test for piercing the corporate veil is not met because "there is no suggestion that Waldvogel was one in the same, without separate mind or existence, as WW3." Dkt. No. 45 at 12. Furthermore, they contend that the second element is not met because Bich "has not plead[ed] fraud" and because there is "no showing that Waldvogel's ownership of WW3 was used to commit any unjust act. *Id.* Finally, the defendants assert that the third element is not met because the plaintiffs have not shown what actions Waldvogel took to proximately cause Bich's loss. *Id.* None of these arguments support the defendants' argument that they are entitled to judgment as a matter of law on the plaintiffs' theory of liability.

First, the plaintiffs have put forth evidence to suggest that Waldvogel exercised complete control and domination over WW3. The plaintiffs point out that Waldvogel is the sole owner and member of WW3 and that it did not conduct business pursuant to any sort of operating agreement. PPFOF ¶ 9. The plaintiffs also assert that Waldvogel performed all book-keeping for WW3 and dictated WW3's financial decisions. *Id.* at ¶¶ 10, 21, 51–52. These specific facts, along with the inferences that may be drawn from the evidence, constitute evidence from which a factfinder could conclude that Waldvogel exercised complete control and domination over WW3.

Second, the plaintiffs have also put forth evidence from which a factfinder could conclude that Waldvogel used his control over WW3 to commit a "dishonest and unjust act in contravention of" his legal rights. *Olsen*, 142 Wis. 2d at 484. The plaintiffs assert that Waldvogel transferred ownership of the Property from himself to WW3 for $0 in order to "create a level of separation

24

between the [Property] and the facility and [him]self." PPFOF ¶ 52. Furthermore, the plaintiffs assert that, after being promised that his investment would be backed by the Property, Waldvogel, through WW3, sold the Property and did not remit any of the funds to the plaintiffs. *Id.* at ¶¶ 104–07. This evidence, in conjunction with the inferences that may be reasonably drawn from it, is sufficient to support the assertion that Waldvogel used his control over WW3 to allow it to obtain control of, lease, and then sell the Property without remitting any of the funds to the plaintiffs, all in violation of the promise that Waldvogel allegedly made to the plaintiffs.

Finally, the plaintiffs have put forth sufficient evidence to support the existence of the third element—that Waldvogel's control over WW3 proximately caused their loss. As mentioned above, Waldvogel, through WW3, leased and sold the Property and did not remit any funds to the plaintiffs. It was Waldvogel's control over WW3, and relatedly, over the Property, that allowed him to take such actions without the consent of the plaintiffs. Of course, this element, and the elements above, are contingent upon various findings that the factfinder may make. If the factfinder concludes that Waldvogel never made such a promise to the plaintiffs or that the defendants are not otherwise liable to him, then there would be no need to pierce the corporate veil. It thus follows that while the defendants are not entitled to summary judgment on this issue, neither are the plaintiffs at this stage of the proceedings.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion for partial summary judgment (Dkt. No. 25) is **GRANTED-IN-PART** and **DENIED-IN-PART**, and the defendants' motion for summary judgment (Dkt. No. 20) is likewise **GRANTED-IN-PART** and **DENIED-IN-PART**. The plaintiffs' motion is granted as to Charles Bich's breach of contract claims based on the loans he made to WW3 and Waldvogel. In all other respects, the plaintiffs' motion is denied. The

defendants' motion is denied as to the same breach of contract claims for nonpayment of the loans made by Charles Bich to WW3 and Waldvogel, and as to the plaintiffs' claim for unjust enrichment and "piercing the corporate veil."  In all other respects, the defendants' motion is granted.  The Clerk is directed to set the matter on the court's calendar for a telephone conference to discuss further proceedings.

**SO ORDERED** at Green Bay, Wisconsin this <u>30th</u> day of December, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge